# UNITED STATES DISTRICT COURT

for the

Middle District of Alabama

RECEIVED

2019 SEP 17 A 9: 39

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

372 FRONTIER CIRCLE, AUBURN, ALABAMA 36832

)
)
)
)
)
)

Case No. 3:19mj296 ALB
HACKETT, CLK
DISTRICT COURT
MIDT ALA

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Eastern _____ District of _____ Alabama _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC Section 1001(a)(2) | False Statement to a Federal Agency |
| 18 USC Section 1519 | Destruction, alteration, or falsification of records in Federal Investigations |

The application is based on these facts:

See Attached Affidavit in Support of Application for Search Warrant.

☐ Continued on the attached sheet.

☑ Delayed notice of **14** days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Scott Sullivan, Federal Bureau of Investigation
*Printed name and title*

Sworn to before me and signed in my presence.

Date: **4-17-19   9:32 am**

_____
*Judge's signature*

City and state: Montgomery, AL

Andrew L. Brasher, U.S. District Judge
*Printed name and title*

RECEIVED

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA SEP 17 A 9: 39

IN THE MATTER OF THE SEARCH OF: **372 FRONTIER CIRCLE, AUBURN, ALABAMA 36832**

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
Case No. 3:19mj296-ALB



## **AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE**

I, Special Agent Scott Sullivan, being first duly sworn, hereby depose and state as follows:

## **INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as **372 Frontier Circle, Auburn, Alabama 36832**, hereinafter "PREMISES," further described in Attachment A, for the things described in Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation, and have been since January 6, 2019. Your Affiant is presently assigned to the Mobile Field Office, Montgomery Resident Agency with responsibility for investigating matters related to counterterrorism and other crimes. Based upon my training and experience, I am familiar with the types of criminal activity perpetrated by criminals and terrorists, to include acts of violence. Given my training and experience investigating various criminal violations and national security violations, I know that subjects utilize thumb drives to store information because it is easily

concealable and transportable. In addition, it is a good storage device because it cannot be accessed through wireless capabilities.

3.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## **PROBABLE CAUSE**

4.     The United States, including the Federal Bureau of Investigation, is conducting a criminal investigation of Nayef Qashou regarding possible violations of 18 U.S.C. § 1001 and 1519.

5.     On October 9, 2015, Nayef Qashou arrived at the Atlanta Hartsfield-Jackson International Airport from Paris, France, (CDG) aboard DL 83. Qashou was referred to the secondary area for additional questions by Customs and Border Officers. Qashou told Customs and Border Officers he was coming to the United States to live with his brother, and was planning to enroll at a community college in Opelika, Alabama, to study nursing. Qashou was then asked some general questions about his family and acquaintances that reside in the U.S. and was then released without incident. Qashou is a dual Jordanian and United States citizen.

2

Throughout the course of the investigation, Qashou has been interviewed on numerous occasions.

6.      On December 4, 2015, Qashou was interviewed by FBI Task Force Officers at his residence in Auburn, Alabama.  During this first encounter with FBI Task Force Officers, Qashou stated he was born in the United Arab Emirates and lived in Yanbu, Saudi Arabia, with his family for approximately 11 years as a small child.  Qashou attended kindergarten through 12th grade at an American school in Saudi Arabia.  During this time, he became a naturalized United States citizen through his parents.  In 2013, Qashou traveled to Alabama to enroll in college after graduating from high school.  According to Qashou, he stated he did not do well during his enrollment at UAB and returned home to Saudi Arabia after just one semester. According to Qashou, he stated he was in Jordan during January 2014 to visit relatives who lived there.  While there, he was picked up and questioned one night by the Jordanian police because he was walking down the street after dark.  Qashou stated he told Jordanian investigators he was not part of any terrorist group after they accused him of attempting to travel into Syria and was not in contact with anyone prior to or during his travel in Jordan.  Qashou stated he then told the Jordanian investigators he wanted to go home to his family in Saudi Arabia, and they released him where he returned via taxi cabs.  Qashou stated he was having a tough time at home after returning to Saudi Arabia from the United States, he heard through the media there was a revolution taking place in Syria, and wanted to get involved.  Qashou was not enrolled in school and did not have many friends.  Qashou wanted to help his brothers fight and offer assistance to

3

those seeking protection from the Syrian government. Qashou heard through news articles online, and on television, that the border was open and he decided to travel into Syria to join the Free Syrian Army. After returning from Jordan to Saudi Arabia, Qashou informed his parents what happened, and they encouraged him to return to the United States to continue his education. Qashou's father then booked him a flight back to the United States. Qashou stated during this interview that he considers himself a conservative Muslim and his mother, father, and brother as moderate Muslims. Qashou stated he does not use any social media because it is a waste of time. Qashou would not allow interviewing Task Force Officers to look at his phone because he has photos and messages on the device that he wanted to keep private.

7.     On December 22, 2015, Qashou was interviewed at the Auburn FBI Resident Agency. During this second encounter with FBI Agents and Task Force Officers, Qashou stated he believed he was at the FBI in order to clear concerns, suspicions, and uncertainty as to if he had intentions of hurting anyone or was involved in anything. Also present during the interview was Qashou's father and brother. Qashou once again told investigators he was not doing well in college in 2014, while in Saudi Arabia, and he felt he could do better work by helping the Syrians defend themselves. Qashou stated the Islamic State of Iraq and Syria (ISIS) and Al Qaeda were made out to be more than they were by the media, and both have been blown out of proportion due to overreaction by the press. Qashou heard of the Paris attacks and could understand why forces attacked Paris. Qashou stated he sympathized with the motives behind the attacks, but did not agree with the killing of innocents to further their cause. Qashou stated

4

he valued innocent life.  Qashou stated the attacks were in retaliation for the bombings in Syria by the French military.  Qashou stated the attacks in San Bernardino, California, were not terrorist related, but stated the attacks were due to misinterpretations of Islam due to bad influences on the attackers.  Qashou stated he had an encrypted messaging application on his phone, but he deleted it.  The application is an open source instant messaging application for smartphones that offers end-to-end encryption for every text, image, and voice message.  Qashou further stated he did not use the application and never set it up.  Qashou then gave consent for agents to search his phone.  Qashou stated he knew that he would be coming to meet with the FBI, so he cleared off his phone because Islam is very private, some of the lectures he had were sensitive, and it was sensitive times.  Qashou further stated he may have overreacted in erasing the contents of his phone, but did not intend to hurt anyone.  Qashou reiterated that he only installed the application and never used the application.  Later, Qashou stated he searched private messaging applications and found an article about using encrypted applications in Syria.  Qashou stated while in Saudi Arabia, he searched about migration, hijra, to Syria.  Qashou found and downloaded a pdf file that described how to make hijra to the Islamic State, and which listed two applications as means and methods of contact in Syria.  One of the two encrypted applications is a freeware instant messaging mobile application that uses a smartphones data plan or Wi-Fi to transmit and receive messages, photos, videos, sketches, mobile webpages, and other content after users register a username.  The encrypted application is known for its features preserving users' anonymity, such as allowing users to register without providing a telephone number.

5

Qashou was questioned about where he used his phone and he stated he only used his phone in his brother's apartment. Qashou was then confronted by agents about his walking only as far as a nearby public Wi-Fi spot for use. Qashou responded by stating he took walks to listen to the lectures and finally stated he had been talking to some Muslims online who seemed to live in Syria. Qashou then admitted he communicated over an encrypted application with two Muslims who were reportedly in Syria. Qashou asked them if it was possible for them to help him get into Syria to fight the oppressive regime and the Iranian militias. Qashou stated approximately three months prior to this interview, while using the username "Abu Tawakul," Father of Trust, on the encrypted application, he communicated with "Abu Zubair1" and "Abu Jihad." Qashou stated he did not know who Abu Zubair1 and Abu Jihad actually were. Qashou stated Abu Jihad is not part of ISIS due to his statement that the ISIS caliphate is a false caliphate. Qashou stated he typed names similar to his into the encrypted application to find Abu Zubair1 and Abu Jihad. Abu Zubair1 was associated with the Army of Conquest (Jaish al-Fatah) and Qashou did not know who Abu Jihad was affiliated with. Qashou stated he first typed names in at random to find people to talk to, but later stated they were not completely random. Both Abu Zubair1 and Abu Jihad spoke about how to get into Syria, but did not agree to help Qashou with travel. Qashou stated he communicated over an encrypted application because the group was not politically approved. Qashou stated he was planning on flying to Turkey after he got a job and could save up money for a ticket. After getting to Turkey, Qashou stated they would then tell him where to go and he would be met and led the rest of the way to Syria. Qashou wanted to

6

fight against the Iranian militias and regime of Bashar Al-Assad, and further stated the claim of ISIS of a caliphate is false because ISIS is killing Muslims. According to Qashou, the Army of Conquest was made up of subgroups to include the al-Nusra Front. Qashou stated he did not align himself with the more extremist view of the al-Nusra front because they fought against the Free Syrian Army, which Qashou supported. Qashou further stated, if he could get to Syria, he would go and fight. Qashou stated he was willing to die for his principles and to throw off the regime of Bashar Al-Assad.

8.      On December 30, 2015, Qashou and his brother returned to the Auburn FBI Resident Agency to retrieve his cell phone. During a brief conversation with agents, Qashou assured investigators he no longer wished to travel to Syria and engage in the fight.

9.      For approximately two years, other investigative strategies were used. On December 15, 2017, Qashou was interviewed at the Hartsfield-Jackson Atlanta International Airport in Atlanta, Georgia, after attempting air travel. Qashou stated he was flying to Amman, Jordan, in order to go visit relatives in Palestine, and to possibly find a wife. Qashou stated he intended on returning to the United States in approximately three weeks in order to begin the spring semester in school. At the same time, additional agents were interviewing Qashou's brother who also stated Qashou was flying home to visit family. Qashou stated he had no desire to travel and fight with ISIS. Qashou stated he was in contact with people on an encrypted application approximately two years ago. He believed the individuals to be fighting along with the Syrian opposition were fighting against Bashar Al-Assad and the Syrian government.

7

Qashou stated he no longer used the encrypted application and has not communicated with any of those individuals for approximately two years. Qashou stated the timing is currently not right for him to travel to Syria. Qashou stated he has to consider his family ties before traveling to fight with the Syrian opposition and believes he could do more good living in America. Qashou stated he understood it would be a waste of an opportunity if people attempted to travel to Syria to fight, and as a result, got put in jail because of the current laws. Qashou stated he does not support terrorism or acts that threaten the safety of Americans or anyone else. Qashou stated he believed in positive collaboration to change things because he strongly values peace and believes peaceful societies should not be disturbed. Qashou stated at this interview he wanted to focus on finding a wife and on his studies. Qashou stated he was currently watching a lot of Nouman Ali Khan videos. Nouman Ali Khan is a moderate Muslim scholar that is popular on YouTube and has an Islamic school called Bayyinah institute. Nouman Ali Khan has spoken out against ISIS in the past. Qashou stated he did not believe Americans are the infidel. Qashou stated he did not know anyone that may be a terrorist and would notify authorities if he felt like someone was going to cause harm to someone else. Qashou stated he does not want to practice radical ideas of Islam, but does want to explore them without disruption from government representatives. Qashou consented to agents looking through his cell phone which yielded nothing incriminating nor derogatory in nature. After the interview, while agents were waiting with Qashou for his ride home, Qashou stated he did not believe the aircraft terrorism threat is real. A few days after this interview, Qashou emailed investigators a research paper he had written for school and stated he

8

felt investigators should read it because he felt the American government has made numerous violations on American individuals.

10.    On December 20, 2017, Qashou was interviewed at his residence by investigators and also present was Qashou's brother. Qashou stated he wanted to make it clear to the FBI that the reason he was previously using an encrypted application on his cell phone was because he was protecting himself as a form of privacy. Qashou further stated he had no criminal intent in mind when using the application, and it had absolutely nothing to do with hurting other people. Qashou continued to state as he did in previous interviews that he values the principle of life greatly and he values the sanctity of life most. Qashou then made reference to the Orlando nightclub shooting and stated it was done by a person that was mentally ill and was currently not taking his medications.

11.    On December 22, 2017, Qashou was interviewed at the Auburn FBI Resident Agency. Qashou brought his laptop and cell phone, and he consented to a search of them. A search of the cell phone and laptop did not reveal anything derogatory. During the interview, Qashou stated he would like to see the Syrian opposition achieve an Islamic State in Syria due to the way Bashar Al-Assad is ruling the country and treating the citizens. Qashou approved of ISIS as long as it agreed with Islamic teachings. Qashou stated he does not approve of beheading and stated he does not think the mission of ISIS is to annihilate Muslims. Qashou does not view ISIS as a group that is fighting a traditional Sunni/Shia war. Qashou stated he believed ISIS is fighting a humanitarian war that will benefit all Muslims in the Middle East.

9

Qashou further stated an Islamic State would benefit the United States because it would then have a reliable partner to negotiate with in the Middle East. Qashou stated some aspects of Salafism and Wahhabism have merit, but was unable to articulate which aspects. Qashou stated he does not believe in violence and further stated those who incite violence with words should be dealt with accordingly. Qashou ended the interview by stating he felt it was his duty as a Muslim to inform the interviewing agents that he thinks the Boston Marathon bomber, Dzhokhar Tsarnaev, is innocent and the FBI should reopen the case to examine all evidence.

12. On August 2, 2018, Qashou was interviewed at the Auburn FBI Resident Agency. Agents then questioned him about his research paper which he previously provided to agents. His paper discussed his perceptions of the U.S. government's harassment of Muslims in the United States and his proposed solutions, advocating for changes in policies and procedures to protect all U.S. citizens. Qashou stated during the interview he believed in just retaliations during war, and in war you would then follow the principle of self-defense and eye for an eye. Qashou stated if he had first-hand knowledge of an attack being planned, he would report it to law enforcement. Qashou stated there are extremists in Islam just like in any other religion, although he believed the media drastically exploits them and there are actually less than reported. Qashou stated there was a period in his life where he thought it would be a good idea to make hijrah to Syria. Qashou stated he would go to Syria for humanitarian purposes, social services, and medical services. Qashou would also assist in combating the Syrian regime. Qashou stated that during his research on the truth about what was going on in Syria, he decided to research

10

how to migrate to Syria, and learned the border was closed for anyone trying to do so. In the article in which he learned the border was closed, he also learned there was an encrypted application that people use to help them migrate to Syria, and he added approximately 200 names in the application with the hope someone would help him. Qashou stated he was never comfortable with using the encrypted application because he thought it may be an application created by an intelligence agency to monitor Islamists wanting to go to Syria to fight. Nonetheless, Qashou used the encrypted application to connect with several individuals, one of which suggested he carry out an attack in the United States. Qashou stated he ceased communicating with the individual anymore because he did not agree with the suggestion. Qashou stated he hoped the United States government will make it clear to other countries that they should keep their hands off of United States citizens and that United States citizens come first before any government, as long as there is no clear evidence that the citizens are engaged in crime. Qashou stated he likes the idea of an Islamic State, but does not think it is appropriate for all societies in the world. Qashou thinks an Islamic State would only be successful in a region in which the people would accept it. Qashou stated the Islamic State should rule by sharia law. Qashou then referred back to some of his research he conducted on ISIS and stated he put a lot of videos and two or three notepad documents on two thumb drives. Qashou stated he made these thumb drives so he could give them to people to help them get an un-biased understanding of ISIS. Qashou did not feel like he could freely share this content with other people, however, because the government may misunderstand what he is doing and overreact. Qashou stated he

11

may not agree with all the views in the videos, but does agree with a few merits of the research in the defense of Muslim lands. Qashou stated he gave the thumb drives to four individuals. One of the individuals was an FBI Confidential Human Source (CHS), two individuals were known acquaintances of Qashou at the mosque, and one individual is unknown. Qashou later emailed interviewing agents a list of videos he had on the thumb drives, and he claimed the list was complete. The list Qashou emailed agents only contained "The Light Reloaded" and "The Light Revelations." "The Light Reloaded" and "The Light Revelations" are video series started in 2010 that focus on the reestablishment of the Islamic Caliphate. Many of the videos are pro-ISIS and sharing them could be considered an ISIS recruitment technique.

13.     On September 25, 2018, Qashou was interviewed at the Auburn FBI Resident Agency. During the interview, Qashou stated the individuals he gave thumb drives to containing the videos simply gave him the thumb drives back. Qashou stated the individuals did not seem interested in discussing the content of the videos so Qashou did not further engage them for discussion.

14.     On October 9, 2018, Qashou was interviewed at the Auburn FBI Resident Agency. Qashou and interviewing agents then began discussing some of "The Light Reloaded" videos he provided the interviewing agents and his stance on informants. Qashou would not elaborate very much on his opinion on the videos, but would generally state that they are good for Muslims and good for his research. Qashou would continuously state that he found the

12

videos interesting. Qashou also agreed with interviewing agents that people do lie and they may not tell the truth, so it is necessary to use informants in an attempt to understand the truth.

15.   On October 23, 2018, Qashou was interviewed at the Auburn FBI Resident Agency. The intent of the interview was to further discuss additional videos from "The Light Reloaded." Qashou once again would not elaborate on his views on the videos and would only offer non-confrontational answers when being asked questions. During this interview, Qashou stated he understood ISIS is a designated Foreign Terrorist Organization. Qashou also stated he understood it was against the law of the United States to provide support to these organizations whether it be financially or actively recruiting individuals to help support their cause. Qashou stated during this interview, "If you would have asked me if I supported ISIS two to three years ago, I would have stated I one hundred support ISIS and I one hundred support the United States of America. But now I have learned more about what these groups like ISIS do and I do not support all the things they do." Qashou stated while he does agree with what groups like ISIS are trying to accomplish, such as an Islamic Caliphate, he does not support some of the ways in which they are trying to accomplish it.

16.   On November 6, 2018, Qashou was interviewed at the Auburn FBI Resident Agency. The intent of the interview was to further discuss additional videos from "The Light Reloaded." Qashou once again would not elaborate on his views on the videos and would only offer non-confrontational answers when being asked questions. Qashou did ask agents if there was any time someone could be justified in fighting back against the United States.

13

17.     On January 23, 2019, Qashou was interviewed at the Auburn FBI Resident

Agency. The intent of the interview was to follow up with him about his recent transition to

university studies and the status of his father being questioned by Jordanian authorities in

December 2018. During the interview, Qashou revealed much more information detailing his

reasons for attempting travel to Syria in January 2014 and his stance on the establishment of an

Islamic Caliphate. Qashou stated his father was stopped and questioned by Jordanian authorities

while attempting to travel to Palestine and was questioned about Qashou. Qashou stated his

father was extremely upset and his father told him if it ever happened again, then his father

would cut off support to him financially. Later in the interview, Qashou became agitated that the

investigation was taking so long and wanted to know why. Agents told Qashou it was because

he attempted to travel to Syria through Jordan and was detained by the Jordanian authorities.

Agents then told Qashou it was against the law to attempt to join ISIS due to the group being

designated a Foreign Terrorist Organization by the United States of America. Qashou stated he

understood that, but stated he supports the Islamic State (IS). Agents then asked Qashou why he

was walking by the Jordanian and Syrian border several years ago. Qashou stated he was

watching the news and watching videos online, and learned there may not be a wall or fence up

any longer on the border of Jordan and Syria, and that he could simply walk right in. Qashou

stated he then took a bus to a border town, got off of the bus, and began walking towards the

border. Qashou stated after reaching the border, he hoped that one of the groups would welcome

him with open arms and get him to the right Islamic faction that he was looking to join. Qashou

14

stated he was approached by a Jordanian military officer that asked him if he was trying to travel into Syria, and Qashou admitted that he was. Qashou stated he was taken into custody by the Jordanian authorities and was told during his interrogation he could either talk or be tortured. Qashou told them his life story, and the Jordanians released him so he could go back to his family. Qashou stated he did not intend to tell his family about the incident, nor did he plan on telling his family about traveling to Syria once he arrived. Qashou was then asked why he did not have any ambition to go to any other countries with an ISIS presence and he stated he would probably travel to assist ISIS in other countries, but would have to do some research to see where he could help. Qashou was then asked what he would do to assist the Islamic groups in Syria and he stated he would most likely utilize the skills he has to help the group. Qashou stated if he could travel to Syria legally right now, he would go.

18.    On February 13, 2019, Qashou was interviewed at the Auburn FBI Resident Agency. The intent of the interview was to establish a baseline of Qashou's beliefs in order to determine which Islamic groups he was willing to join if he traveled to Syria and to determine what he is willing to do as a supporter for ISIS if his travels were successful. During this interview, Qashou revealed even more information about his travel plans, intentions after arriving in Syria, and his beliefs involving the establishment of an Islamic State. Qashou stated after being detained by the Jordanian authorities in January 2014, he conducted a google search on "How to make hijrah to Syria?" Qashou stated the results pointed him to a pdf file that gave him instructions on how to download an encrypted application and which users to add as

15

contacts. Qashou again admitted to downloading the encrypted application, making contact with approximately seven users, which he believed were ISIS, specifically Jaish al-Fatah, and being told that he should conduct an attack in the U.S. This time, however, Qashou would not tell interviewers exactly how he responded to the suggestion to conduct a U.S. attack. He stated he essentially responded by saying the only way he could justify an attack is for it to be against U.S. Armed Forces personnel on U.S. soil. However, he reiterated he would not do it because he did not want to cause grief for his family in Saudi Arabia. The above statement shows Qashou has not been truthful in telling investigators about his activity on the encrypted application, nor has he been forthright with regard to his willingness to advise investigators of someone trying to cause harm, suggest harm, or conduct an attack in the United States. Qashou stated during interviews on December 15, 2017; December 20, 2017; and August 2, 2018, that he does not believe in violence and would inform agents of any type of plan to attack the United States.

19. During the same interview, Qashou stated he would want to assist ISIS by serving as a Soldier or an advisor to those in higher positions. Qashou stated he would drive fuel trucks, feed troops, and use a gun to defend against U.S. led attacks against ISIS. Qashou further stated he would execute detainees if ordered to do so by ISIS superiors, if they were found guilty in the ISIS courts. Qashou further stated he would execute a U.S. Soldier if ordered to do so by ISIS superiors, if the Soldier was found guilty in ISIS courts.

20. During the interview on February 13, 2019, Qashou admitted he cleared his phone before arriving for the interview on December 22, 2015, because he wanted to avoid FBI

16

scrutiny and to protect individuals, who he believed were involved in the Syrian conflict, and was communicating with on the encrypted application.

21.     Since beginning this investigation, your affiant has interviewed Qashou numerous times. During the course of these non-custodial interviews, your affiant has discovered that Qashou has minimized his Islamic belief system and his support of radical Islamic ideology. For example, in many interviews Qashou claimed to disavow violent radical Islamic ideology, including beheadings and other forms of Islamic inspired violence. However, based on training and experience, your affiant believes that Qashou has been trying to minimize the intensity of his actual belief system in order to undermine law enforcement's interest in him. Despite Qashou's attempts to distance himself from radical Islamic ideology, your affiant is aware that Qashou has watched radical Islamic propaganda that advocates violence against non-Muslims. During the course of this investigation, your affiant has learned that Qashou actually believes that violence against non-Muslims may be appropriate, especially if violence is targeted against United States Forces. Furthermore, you affiant has learned that Qashou has used encrypted phone applications to communicate with suspected ISIS or Jaish al-Fatah operatives, to which Qashou has admitted. The nature of this encrypted communication was to discuss Jihad style attacks against U.S. Forces in local areas and to discuss traveling to fight in Syria. In addition, during an interview, Qashou expressed the option of restarting his research on ISIS if the investigation were to be terminated.

17

22.     In addition, during a meeting with an FBI Confidential Human Source on or about May 22, 2019, Qashou stated if the investigation ended tomorrow he would have competing concerns. In the short term, Qashou stated he felt like he must take care of his family when they moved to Auburn this summer. However, Nayef stated he had a strong inclination to go engage in the 'causes' with the struggle to replace authoritarian regimes. Qashou further stated he would have to do some basic research and studying to see what the situation was in order to know what groups he would be interested in or inclined to join or support.

23.     On September 16, 2019 Qashou arrived by his personally owned vehicle, white Toyota Corolla bearing License Plate No. 43BB616, to the FBI Auburn Resident Agency Office. After his arrival he met with Task Force Officer Nathan Faggert and Special Agent Scott Sullivan where he was arrested based on an indictment, read his Miranda Rights, and interviewed inside the FBI Office. During the course of the interview, ISIS propaganda videos by Anwar Awlaki, Abu Baraa, Al Hayat, Al Furqan, The Light Reloaded, and The Light Revelations were discussed. Some of these videos have also been previously discussed in past interviews with Qashou. During this interview, Qashou advised he kept these videos on two USB thumbs drives, approximately 30 videos on one USB thumb drive and 50 videos on the other USB thumb drive.

24.     After the interview Qashou was transported to the FBI Montgomery Resident Agency Office for processing before being booked into the Montgomery County Detention Facility. The vehicle Qashou arrived in was inventoried, per FBI policy, before being delivered to his mother per his request. During the inventory two USB thumb drives, one green in color

18

and one red in color, were located in a black backpack that belonged to Qashou. Currently, the

vehicle and all contents, including the two USB thumb drives are believed to be in the mother's

possession at the family residence.

## TECHNICAL TERMS

11.     Based on my training and experience, I use the following technical terms to

convey the following meanings:

> a. Storage medium: A storage medium is any physical object upon which computer
>
> data can be recorded. Examples include hard disks, RAM, floppy disks, flash
>
> memory, flash drives, thumb drives, USB drives, CD-ROMs, and other magnetic
>
> or optical media.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

12.     As described above and in Attachment B, this application seeks permission to

search for records that might be found on the PREMISES, in whatever form they are found. One

form in which the records might be found is data stored on a computer's hard drive or other

storage media. Thus, the warrant applied for would authorize the seizure of electronic storage

media or, potentially, the copying of electronically stored information, all under Rule

41(e)(2)(B).

19

13. *Probable cause.* I submit that if a storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on the storage medium, for at least the following reasons:

      a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

      b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

14. Because several people share the PREMISES as a residence, it is possible that the PREMISES will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that it is possible that

20

the things described in this warrant could be found on any of those storage media, the warrant applied for would permit the seizure and review of those items as well. HOWEVER, this search warrant is only for the purposes of seizing thumb drives that may be the ones containing the files discussed with Qashou during his interview.

## CONCLUSION

15.     I submit that this affidavit supports probable cause for a warrant to search the PREMISES described in Attachment A and seize the items described in Attachment B.

Respectfully submitted,

Scott Sullivan
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
on September 17, 2019:

UNITED STATES MAGISTRATE JUDGE
DISTRICT

21

## **ATTACHMENT A**

*Property to be searched*

The property to be searched is **372 Frontier Circle, Auburn, Alabama 36832**, further described as a two story half brick and half wood structure. The first floor of the premises is majority brown brick with the wood siding tan in color, brown trim, and white framed windows. The front door to the premise, is a brown metal door, with an elongated window going from the top of the door and ending in the middle of the door. The garage is a double car garage without a divider down the center. Color of main garage door is unknown.

## **ATTACHMENT B**

*Property to be seized*

All records relating to violations of 18 U.S.C. § 1001 and 1519. Those violations involving Nayef Qashou and occurring after December 4, 2015 including:

Two thumb drives

1.     For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a.   evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.   evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.   evidence of the lack of such malicious software;

d.  evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e.  evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f.  evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h.  evidence of the times the COMPUTER was used;

i.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k.  records of or information about Internet Protocol addresses used by the COMPUTER;

l.  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite"

2

web pages, search terms that the user entered into any Internet search engine, and
records of user-typed web addresses;

m. contextual information necessary to understand the evidence described in this
attachment.

This warrant authorizes a review of electronic storage media and electronically stored
information seized or copied pursuant to this warrant in order to locate evidence, fruits, and
instrumentalities described in this warrant. The review of this electronic data may be conducted
by any government personnel assisting in the investigation, who may include, in addition to law
enforcement officers and agents, attorneys for the government, attorney support staff, and
technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or
copied electronic data to the custody and control of attorneys for the government and their
support staff for their independent review.]]

3